# Rikard v. The State.

### Murder.

(Decided January 30, 1917. 73 South. 992.)

1. **Homicide; Evidence.**—Evidence of the possession of goods stolen from the deceased shortly after the murder is sufficient to authorize a conviction in the absence of explanation to the satisfaction of the jury, or sufficient to generate a reasonable doubt of guilt.

2. **Same.**—Where a prosecution was for murder, evidence that on a certain day, a witness saw defendant driving cattle belonging to deceased from the direction of deceased's house was admissible.

3. **Evidence; Opinion; Expert.**—Where a witness testified that he had been a practicing physician for sixteen years, he was competent to testify as to the place of entrance of the shot on deceased's head that produced his death.

4. **Homicide; Evidence.**—Evidence as to meeting defendant coming away from the place of deceased about the time of the murder, was admissible.

5. **Trial; Reception of Evidence; Motion to Exclude.**—A motion to exclude the answer of a witness that he did not remember the day of the month, but remembered the day they said it was, was properly overruled.

6. **Homicide; Evidence.**—Where the prosecution was for murder, it was not error to overrule a statement of the witness "This is how he came to make the deal," in connection with evidence that defendant had told witness that deceased had gotten into a little trouble, as deceased had hacked some ties across the line, and was going away, and that defendant had gotten into a deal with him.

7. **Evidence; Hearsay.**—Testimony that a few weeks before the death of decedent, certain witnesses had tried to buy cattle from him, and that each time they tried, deceased had refused to sell them, was hearsay, and inadmissible, defendant not being present at the conversation.

8. **Trial; Reception of Evidence; Rebuttal.**—Where a defendant's witness had simply testified that he had no knowledge one way or the other as to whether deceased would or would not sell or kill his cattle, and that he had never tried to buy them, and had never seen anyone else try to buy them, and knew nothing of them or how deceased regarded them, evidence by witnesses for the state, in the absence of defendant, that they had tried to buy cattle from deceased, and he had refused to sell them, cannot be said to be in rebuttal of the testimony of the witnesses for defendant.

APPEAL from Colbert Circuit Court.

Heard before Hon. C. P. ALMON.

John Rikard, alias John Rickard, was convicted of murder in the second degree, and appeals. Reversed and remanded.

J. B. Casey, who lived on a mountain chain, about ten miles west of Tuscumbia in a sparsely settled, wooden region, was found dead, and his body partly decomposed, in a shallow grave, about a quarter of a mile from his home. He lived alone, had but few neighbors, and owned five head of cattle, which were sheltered in one of the rooms of his house; Casey living in the other. Defendant was engaged in the cross-tie business, and was constantly in the woods with his gun taking up cross-ties, and otherwise attending to his cross-tie business. Between the time of Casey's disappearance and the finding of his body, defendant was seen on the road driving Casey's five head of cattle and claiming that he had bought them of Casey, paying him $100 therefor. The exceptions to the evidence sufficiently appear.

Dr. W. H. Green testified that he was a practicing physician, had practiced medicine for 16 years, and, on being questioned as to the cause of the death, he was asked with reference to the skull: "In your judgment, which way did the shot enter?" And witness answered:

"It entered from the outside, because the hole is there on the outside on the skull. In the natural course, a shot penetrating the skull at the point where the hole is would have entered the brain. From the force it seemed to have had, I think it would have knocked it off and produced death. The bone you exhibited to me is a lower part of the human jawbone."

The testimony of Malone was that he met Rikard on October 25, 1914, coming from up to Jackson Creek, a mile and a half from where Casey lived. Rikard was going away, not toward, Casey's place, riding a mule, and then detailed the conversation he had with him. Practically the same testimony was given by Sexton.

Assignments of error referred to are as follows:

(7) The court erred in overruling the motion of defendant to exclude the answer of the witness Hester: "I do not remember the day of the month. I remember the day they said it was."

(8) The court erred in overruling a motion to exclude the statement of the witness Inman: "This is how come him to make

[Rikard v. The State.]

the deal." This in connection with the testimony that Rikard had told him that Casey had gotten into a little trouble, and he had gotten into a deal with him, as Casey had hacked some ties across the line, and he was going away.

Alex Gibbs testified that he went over to Barton to Rikard's barn on October 28th, and offered Rikard $125 for some cattle that were in the barn, but he said he would not take it.

JAMES H. BRANCH, for appellant. W. L. MARTIN, Attorney General, and P. W. TURNER, Assistant Attorney General, for the State.

BRICKEN, J.—(1) The defendant, John Rikard, alias Rickard, was charged with the offense of murder in the first degree, and was tried and convicted of murder in the second degree and sentenced to the penitentiary for a period of 15 years, in the circuit court of Colbert county. This was a case of circumstantial evidence, and the prosecution was based principally upon the fact that, shortly after the death of Casey, the defendant was found to be in the possession of personal property which had been stolen, consisting of five head of cattle, which had belonged to deceased. Numerous objections were interposed during the trial and exceptions reserved touching the sufficiency of the testimony offered by the state, and a motion was made to exclude the testimony of the state on these grounds. The motion was properly overruled, and the court committed no error in refusing to give the general affirmative charge for the defendant.

"Possession of the fruits of crime, recently after its commission, is prima facie evidence of guilty possession; and if unexplained, either by direct evidence or by the attending circumstances, or by the character and habits in life of the possessor, or otherwise, may be taken as conclusive. This rule of presumption is not confined to the case of theft, but is applied to all cases of crime, even the highest and most penal."—1 Greenleaf, § 34; Malachi v. State, 89 Ala. 142, 8 South. 104.

This presumption is one of fact, to be passed upon by the jury.—Cases supra.

When a larceny, robbery, arson, or even murder with robbery, has been committed, and soon afterwards goods which were stolen at the time the crime was committed are found in the possession of one not having the rightful custody, there is a

presumption more or less strong that the possession was a guilty possession, and that the custodian committed the crime of which the acquisition of the goods was a presumed concomitant. The better authorities hold that this is not a presumption of law, but one of fact. All agree, however, that if the discovery follow close upon the crime, the duty is cast on the custodian to explain how he acquired possession. Failing to do so to the reasonable satisfaction of the jury, or to generate a reasonable doubt of his guilt, he may be convicted, on this evidence alone, of the crime of which the theft was the motive, or concomitant.—*Malachi v. State, supra.*

(2) Under the above well-settled principles of law, the court did not err in overruling the motion to exclude the evidence of witness Brenneman, who had testified that:

"On Wednesday, the 28th of October, 1914, he saw the dedefendant driving J. B. Casey's [deceased's] cattle from the direction of Casey's home towards Barton."—*Martin v. State,* 104 Ala. 71, 16 South. 82.

(3) Dr. W. H. Green was shown to be an expert. He was therefore competent to express his opinion as to the place of entrance on Casey's head of the shots that produced his death. The court therefore committed no error in overruling the objections to the questions propounded to this witness. Neither did the court err in declining to grant the several motions made by defendant to exclude this testimony. This disposes of the second, third, and fourth assignments of error adversely to appellant.

(4) The objections raised to the testimony of witnesses Malone and Saxon were not well taken, and therefore without merit. Their testimony was admissible as a circumstance tending to show the defendant's opportunity for the commission of the crime. The court did not err in letting it stand.—*Jarvis v. State,* 138 Ala. 17, 34 South. 1025; *Barker v. State,* 126 Ala. 69, 28 South. 685; *Spraggins v. State,* 139 Ala. 95, 35 South. 1000.

(5, 6) Assignments of error 7, 8, and 9, relating to the testimony of witnesses Hester, Inman, and Gibbs, are obviously without merit, and the court committed no error in its rulings thereon.

The court did not err in overruling the motion of the defendant to exclude the testimony of each witness examined by the state, separately, severally, and as a whole; and, under the evi-

[Rikard v. The State.]

dence in this case, the court did not err in refusing to give the general affirmative charge for the defendant.—Authorities supra.

(7, 8) The defendant offered only one witness in his behalf, Sam Gardner by name, who on cross-examination by the state, denied that he had any knowledge one way or the other as to whether Casey (deceased) would or would not sell or kill his cattle; that he had never tried to buy them and had never seen any one else try to buy them; in short, that he knew nothing of Casey's cattle one way or the other, nor how Casey had regarded them. The defendant then closed his case, and the state offered in rebuttal, by consent of the court, and over the objection of the defendant, who duly excepted to the ruling of the court, witnesses Sherrill and Breedlove, both of whom were permitted, to testify, over the objection of the defendant, that, some time a few weeks before Casey's death, they had tried to buy them on several occasions; and that each time Casey had refused to sell them, etc. This ruling of the court we must conclude was error, and error of so serious a nature as will necessitate the reversal of this case, for it is not contended that the defendant was ever present at any of the conversations testified to by these witnesses. The testimony therefore was clearly hearsay testimony, by which the defendant was in no sense bound. Neither was this testimony in rebuttal of anything brought out by the defendant, and therefore it was error for the court to permit the witnesses Breedlove and Sherrill to testify to these facts over the objection of the defendant.

The written charges refused to defendant present no new or novel points of law; and, as the case will have to be reversed, we deem it unnecessary to discuss them.

For the error pointed out, the judgment must be reversed.

Reversed and remanded.